Morning, Your Honors. I think this case, of course, is not based on a warrant. It is a probation search, and the two issues that I'd like to dwell upon for at least the first ten minutes, I'd like to reserve maybe four minutes for the response to the city and county, is the following. An issue that was not addressed, and didn't need to be, because in the interlocutory appeal, the fact of this legality of the search wasn't reached, is one is that whether or not there was reasonable suspicion to search, to conduct, to believe that Oscar Sanchez had any, who'd been incarcerated for ten months, was engaged in any criminal activity. And I base the fact that there was a need for reasonable suspicion to believe that he was engaged in individualized criminal activity on U.S. v. Knight's, which was decided in 2001. And this case occurred in 2003, and I believe that U.S. v. Knight's clearly established that there had to be individualized reasonable suspicion to conduct a probation search, as opposed to a parole search, which under U.S. v. Samson required nothing at all, except there still had to be probable cause to believe that the individual resided at the address to be searched. So with respect to, that's the first issue I believe that has to be decided. And the second issue is was there probable cause to believe that Oscar Sanchez resided at the home at the time of the search. And again, there was no probable cause, and the investigation made by the officers and by the probation officer, Wu, was absolutely, fell short of anything approaching. Wu was a probation officer, correct? He was the county probation officer, yes. But he was not Oscar Sanchez's PO, right? No, he was one of the, or maybe the only probation officer utilized to conduct these basically wholesale searches of probationers. And with respect to him, he very easily could have checked, but decided not to, with Oscar Sanchez's probation officer, whereas Oscar Sanchez didn't do that. And under Motley, I believe there's an ongoing duty to check those things. Motley says they have to be reasonably sure they're at the right house, and that all officers have an ongoing duty to make appropriate inquiries regarding the fact receivable to further investigate if insufficient details are relayed. And that wasn't done here at all. Does the record tell us who Oscar Sanchez's PO was? Yes, I believe it's in the record. Towards the end of it, there is an indication, because actually he was released in 2004, early 2004, indicates that he went to see his probation officer. But, you know, as a matter of common sense, obviously this probation officer, Wu, could have just found out who it was. It must be on their computer, I would think. In fact, Wu, although he wasn't, not to dwell too much on Wu, but Wu actually states he read the minute order in the burglary criminal case, that actually caused Oscar Sanchez to be convicted of a burglary. And the basis for this probation search indicates that he had a parole violation, and that also would have put all of them on notice that in addition to being convicted of this particular, I think it was a burglary, I mean it was a robbery, in addition to being convicted of that, he also had a parole violation, and a parole violation often results in a parole revocation. It certainly would have been this instance where he's convicted, and that he therefore would have been spending some time either in jail or in prison on the parole revocation, which might be, and in fact was, considerably longer than the time he served for this particular conviction. And probably that was taken into account by the court. So with respect to the officers, again you have virtually nothing being done to ensure, first of all they had no reasonable suspicion. I'm arguing reasonable suspicion because based on Knight's holds that you have to have individualized reasonable suspicion. U.S. v. Samson holds that with respect to probationers and parolees, probationers run a continuum of the type of rights that they have, that because parole is akin to imprisonment, that therefore there isn't needed to be the same standard, and that, I think I can actually quote from Samson, which says that as we noted in Knight's parolees are on a continuum of state imposed punishment, and on this continuum parolees have far fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment. So based on both, basically Samson confirms Knight's, which held that there had to be individualized suspicion for a probation search. And I think that's really important because there could be no individualized reasonable suspicion that there was a probation search when a person has been continuously incarcerated for 10 months, and so that it couldn't exist. The fact that I believe the, Penales I believe his name is, the leader of the team of the city of Los Angeles police officer team said that he'd had no way of checking that someone was in prison, and I think that's patently absurd that he wouldn't have had access to that. It's just nonsense, and it goes to his credibility, and it goes to the reasonableness of their inquiries. And the Los Angeles County Jail records that were turned over to us indicated he had been actually incarcerated and removed from the county jail to the California Department of Rehabilitation and Corrections, and had gone to a particular prison there. And I think that that, so it was, it's in the jail records that they didn't bother to look at. It's in the, there's a notice in the amendment order of a parole violation and obvious revocation. And so what there was here is a complete failure to have, to adequately seek, to adequately address whether or not he resided at that address. And as I said, with respect to the reasonable suspicion, a complete, there couldn't be no individualized suspicion. Did the court have any questions? Because I think I want to reserve the questions. I'll reserve my, for the rest of the panel. Thank you. Good morning, Your Honors. Glyde Bach on behalf of the City of Los Angeles. I will address the points raised by the appellants in order. The first one being whether or not there was reasonable suspicion to enter the Sanchez home. I'd like to just flatly state that that is just simply not what these cases have held. In fact, the Knight's case, as I pointed out in my brief, expressly reserved this issue and said it's not deciding the issue. In the Knight's case, it's true that there did, there was reasonable suspicion to enter the home. But the Knight's court expressly said we are reserving for another day and another decision whether or not a probationer subject to a probation condition could be subject to a suspicionless search. And that question was answered in the Sampson court. And again, in Sampson, the U.S. Supreme Court said expressly, we are answering the question left undecided by Knight's. And Sampson did find that a suspicionless probation search would be consistent with the Fourth Amendment. So at the time that the search happened, we have, first of all, the case law that was available instructed these officers that what they did was legal. But to the extent that there was any question, we have at best the U.S. Supreme Court saying that this issue is undecided. Was it material that Oscar Sanchez be present in the home or live there? I would say arguably it was not, and that's particularly true in this case because here we have Eva Sanchez stating in her deposition she was aware of this probation search condition. So, and this is undisputed. We have, just like in all these cases, probation or parole. So if P.O. Wu had walked across the bay where his desks are and actually found, let's call him John Doe, Oscar Sanchez's probation officer and said, we're about to do a probation search of Oscar Sanchez at his home. What's his current status? And that person had said, he's in prison. They still would have been able to go forward with the search? Well, I would say that would be a different case only in the sense that in this particular instance, these searches were about the increase of robberies in the neighborhood. And so knowing that he was in prison potentially could have changed their decision to go, but I think that we would at least have, the city would at least have an arguable case that entry into that home would be acceptable because the house itself was subject to the probation condition. This was the last one. I don't understand. What reason would there be to search his house if you knew he was in prison? Well, I would say that probably in this particular, given the facts of this case, the officers would not have gone to the house. Would not have had any right to go to the house. I'm sorry, what? Would not have had any right to go to the house. That's a harder question because honestly, it was the house itself that was subject to the probation search condition. I mean, in that instance, I would say we definitely do not have a specific case authority that would instruct that where you have the residents of a home who are aware that their home is subject to a probation search condition. And actually in Motley, the panel specifically recognized, I think it really was footnote 8, that even if, in Motley it was almost an identical case in which the person that they were seeking was actually incarcerated and the girlfriend was home, they did the search, and the girlfriend was present. And in Motley, I believe it was footnote 8, the court actually noted that arguably the police officers would have had a right to go in even had they known that he had been incarcerated because that was undisputedly, just like here,  And Motley, I would like to point out, is virtually identical to this case. It's the LAPD is investigating an increase in crime in the neighborhood. They have a list of places to go to. Among that list is the Motley case, the home of, I believe it's the Jamerson home. I don't think Motley said, I'm looking for footnote 8, but I can't find it at all. I think it was footnote 3, actually. I could be wrong, but I thought it was 3. But I don't really think the case said that if you know he's not there, the house is a suspicious place. I thought what Motley said related to what your duty is to check to see whether he is there, not that if you know he's in prison and he's not there, you still search because the house is a suspicious place. That's an odd concept. Well, I'm sorry, it is actually footnote 8. Footnote 8 of Motley. A good argument can be made that the apartment remained Jamerson's residence even though he was temporarily away. We need not decide that issue. But, you know, I'd like to get back to that in the sense that in this case, we have to remember, too, that we're viewing it through the prism of these officers. And it's not what could have been done, what should have been done, whether they could have taken other steps. And certainly it's unfortunate they came when the person they were seeking was incarcerated. But we do look at what the officers actually did do and whether or not that was reasonable. And in here we have the officer declarations outlining the steps that they took. On the other side, at best, we have the speculation not even from witnesses but from the attorneys saying this is what could have been done or what should have been done. We don't have anything specific saying, hey, had they done this, they would have realized that he was incarcerated. What we have is only the declarations of these officers pointing out what they did do. And they did check off people who were that they did find were incarcerated or at least in county jail. They did check off people that weren't repeat offenders. So they did narrow this list down and did do a diligent search before they narrowed it down to their list of eight. Scalia. Hard to describe it as diligent. They didn't even ask his own probation office. Well, they were working with the probation department. And I believe that what they did is they did try to do at least a I can understand part of this. I can understand in a situation like this where someone in Wu's circumstance goes to the probation officer and the probation officer says, you know, I haven't heard from this guy in about a year or so. I have no he's supposed to report in regularly and I just he hasn't. Why a probation search in that circumstance would be appropriate to find out if he's there or not. And in that circumstance, the lack of knowledge of where he's there or not is probably not material. Well, my understanding is that when they have these probation searches, you know, they go by the information that is available. They do check the computer. But, you know, these are exhaustive lists. There's lots of people in the area that might be subject to this checking. And so, you know, potentially there are steps that they could have taken. That's true. But I think here we really do need to be circumspect about going too far afield and not looking at, you know, is there anything that the plaintiffs have demonstrated. Had they taken that step, they would have confirmed this. We don't have anything like that. We don't have the probation files, for example. We don't have any, you know, deposition of the probation officer. We don't know what would have been discovered had they done anything different than what they did do. I'm looking at the time, and my counsel and I have agreed that I would have seven minutes. I don't know. Thank you. Unless, Your Honor, you have any more questions for me. Thank you. Thank you. I get more than 45 seconds on my previous case. Good morning. Patrick Hurley for the County Appellees and Defendants. I just have two main points, and I'll take any questions that the panel has. There was a suggestion by Appellant Counsel that the Motley case held that there was an ongoing duty or a duty in this case for Officer Wu to check with the probation officer, the actual probation officer for Oscar Sanchez. I'm sorry. I thought Wu was a probation officer. He was a probation officer, and the suggestion was that he had a duty to check with Oscar. Correct. Or to check the probation department's computer, whichever. Right. And I think there's two points on that. Number one is, you know, whether Officer Wu should have, under best practices, talked to Oscar's probation officer. The Motley case had almost identical circumstances. There was a parole officer who was conducting a search of a parolee. That parole officer could have checked with the parole officer of Mr. Jamerson, who was the parolee to be searched, but he didn't do that. And the majority in Motley found that there was still probable cause to believe that the parolee was a resident of the house to be searched. And so the arguments that are being made by the appellants in this case are really based on, with respect to Judge Reinhart's dissent in Motley as well as Judge Prager's. Pretty good dissent. I thought it was. Unfortunately, it didn't carry the day in Motley. Missed by one vote. And I think that those same arguments don't carry the day in this case. And then the other issue was the minute order that talked about a parole revocation. And I think I'm going to be echoing some of the same arguments that were made in the prior argument, which is that the- I don't think that's very reliable. You know, we're talking about two words in a three-page minute order that mention a parole revocation. Whether Officer Wu should have seen that and whether that should have triggered him, I think, is a question of negligence as opposed to, again, recklessness. And, you know, officers are entitled to make mistakes. And if that was a mistake, if it was something that he should have caught, then there's still either probable cause or, at a minimum, qualified immunity, which is supposed to protect officers from being second-guessed for these types of reasonable mistakes. At the time this search was effectuated, what was the law with respect to whether any suspicion was necessary to carry out this kind of search? Your Honor, my understanding is that the Knight's case, which I believe was 2001, says that no more than reasonable suspicion would be required, but specifically left that issue open. Reasonable suspicion of? Of criminal wrongdoing would be required for a probation. Or was it reasonable suspicion of the person being there? No. Separate issue. There's two points that are being made by the appellants. Number one is that a probation officer would have needed reasonable suspicion of wrongdoing before going to conduct a probation search. And I think, based on the Sampson case, which held that a parole search does not require reasonable suspicion, and this Court's holdings in both Motley and Sanchez, that parole and probation searches, there's no constitutional difference between the two, leads to the conclusion that there's no requirement for reasonable suspicion of criminal wrongdoing before a search of a probationer can be conducted. And the next question is what you do need is probable cause to believe that the person to be searched is a resident of the place to be searched. And that requires a probable cause. Unless there are any other questions. Thank you, counsel. Counsel, can I ask you, the buzzsaw that I see you running into here is your reading of Knights has not been accepted in decisions subsequent to Knights. And the continuum referred to in Sampson was not accepted in the prior decision in this case. The prior decision says, although both Sampson and Motley were paroled rather than probation, we consistently recognize that there's no constitutional difference between them for purposes of the Fourth Amendment. And if, unless we're going to back off a decision in this very case, doesn't that answer the appeal here? I don't think so, because the Supreme Court's decisions dominate and control. But you cited Sampson on the prior panel. And that may be, but there is a section in Sampson that says that. I know the section you're referring to, and you may be quite right, but I'm asking you whether you call it law of the case or adherence to prior decisions from this panel. How do we get around that language? Well, first of all, because the prior decision did not address the legality of the search, it can't be the law of the case. Because what's at issue here isn't whether or not there was a reasonable detention, which there could be if the search was legal. What's at issue here is whether the search, the probation search itself, is legal. And it's my contention, and of course I could be wrong, but it's my contention and I believe that under Knight's, which is confirmed by Sampson v. California, that as to probationers, you have to have individualized reasonable suspicion. Knight's held that the degree of individualized suspicion required of a search is a, and it was talking about a probation search, is a determination of when there is a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy reasonable. So I think Knight says it right there, and then you have Sampson confirming it and saying that the reason they're making a distinction between probationers and parolees is that on a continuum of protections, parolees are subject to less of a protection because parole, they had actually a totality of the circumstances that they go through, but one of them is that it's the imprisonment issue that it's more akin to imprisonment and a host of other issues, too. They're more likely to commit crimes, so forth and so on. But what I guess I'm saying with, and I should have gone into German, actually I don't speak German, but what I, so that's my reading of Knight's, and I do believe that it controls in this instance which has to do with the legality of the search and with respect to the issues raised by the defendants, and we did have a couple of notes on that. I think it's incorrect to assert that it's the house rather than the fact that a probationer resides at a house is an issue. I think when a probationer is no longer residing at the house, is in fact in prison, then under Motley there wouldn't be any reason to have these ongoing inquiries as to whether or not the probationer actually resides at a residence if, in fact, and in that respect it's interchangeable. The problem was to believe that someone resides at a house that's interchangeable with parole and probationers. With respect to that, there wouldn't be any need for Motley's holding that you have to make an ongoing inquiry as to what's going on, as to whether or not the person's actually residing at the house. And there isn't any basis for it. All you had at the right of residing at that house, for example, were some older people, a grandmother with cancer, getting over cancer, poor people who are forced out into the night in their underclothes, I think it's just nightclothes, and just treated horrendously. For what purpose? He wasn't even there. He hadn't been there for ten months. And that's why there has been, and that's very different from Motley where it was about ten weeks. And it's very different from Motley because in Motley, Jani Jamerson, who was the actual parolee, confirmed that he lived there. His mother confirmed that he lived at the address. It's a wholly different set of factual circumstances that gave the officers in Motley probable cause to believe that he resided at the address, or that they had made a – in other words, their inquiries were objectively reasonable. And I don't think you have that here. And that's – I don't think I had anything else to say. And the fact that the Woos Council, the county probation officers, said, well, he missed the two words. That's not acceptable when you're looking at something as serious as this. What kind of mistake is acceptable? What kind of mistake? If we start from the proposition that the law doesn't punish mere mistakes. It's not a mere – Well, what is a mere mistake? Well, I don't think that's a mere mistake. I mean, a mere mistake doesn't mean when you're looking to see whether or not – taken into conjunction with the fact that he also could have checked with the probation officer, which he did not, that he also could have called the CDCR number, inmate locator number. There are things that he could have done. Right. But in the Fourth Amendment context, what is – give me a hypothetical of a mere mistake that a probation officer might make that leads to a search in a house where the person isn't there. I couldn't think of any. That's why I'm asking you. Well, I can't think of one either. But I don't think that his missing those two words constitutes a mere mistake because I think that he's – you know, sloppiness isn't acceptable when people are – constitutional rights are being violated. Then it sounds like you're advocating a negligence standard. No, I'm not. I'm saying that it wasn't objectively reasonable for him not to read that carefully. He didn't – it was objectively unreasonable for him not to read the minute order carefully, and he didn't do that. So that would be my response. And the Court has any other questions? No. Thank you, counsel. Thank you, Your Honors. Thank you. The case just argued will be submitted. The Court will stand in recess for the day. Mr. Hurley, next time check in with me. No. So the judges were asking who you were. Thank you.  Thank you. Good-bye. Good-bye. Good-bye. Thank you. Yeah, no problem. Can I put any of your stuff? Excuse me? Can I put any of your stuff? Do you need help here right now? Oh, that's fine. This is only... They're picking this up later. Oh, okay. This is the box. Thank you. Yeah. My third wife. Thank you. Thank you. Thank you.
judges: Cogan, Reinhardt, Hawkins